IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA   )
                           )
                           )
        v.                 )
                           )   1:11cr344 (LMB)
                           )
HOWARD R. SHMUCKLER,       )
                           )
        Defendant.         )

FILED

DEC 17 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

The issue before the Court is the proper amount of
restitution to be awarded to the victims of defendant Howard R.
Shmuckler ("Shmuckler"), who pleaded guilty to six counts of
wire fraud in violation of 18 U.S.C. § 1343 on April 10, 2012.
The government argues that $1,848,279.00 is the appropriate
amount; Shmuckler contends that the Sixth Amendment limits
restitution to $68,970.00, the amount established by the facts
alleged in the indictment, or in the alternative that the amount
of restitution cannot be more than the amount of loss determined
by the Court for purposes of calculating the advisory Sentencing
Guidelines range.

For the reasons that follow, the Court finds that the Sixth
Amendment does not restrict the restitution award to $68,970.00,
and that the government has produced sufficient documentary
evidence to establish by a preponderance of the evidence that
the proper amount of restitution should be $1,848,279.00.

On July 21, 2011, Shmuckler was indicted on seven counts of wire fraud pursuant to 18 U.S.C. § 1343.  Dkt. No. 1.  The indictment alleged that, as the owner and operator of a purported mortgage rescue business called The Shmuckler Group ("TSG"), Shmuckler devised a scheme to knowingly defraud individuals who came to TSG seeking to modify their mortgages. Indictment ¶¶ 1-4.  According to the indictment, Shmuckler misrepresented his credentials, by claiming to be a Virginia attorney when he was not licensed to practice in the Commonwealth, and his success rate, by wrongfully estimating that TSG succeeded in achieving mortgage modifications 97% of the time.  Id. ¶¶ 4-18.  These misrepresentations enabled TSG to secure clients who paid between $2,500.00 and $22,020.00 for Shmuckler's services and "lull[ed] those victims into a false sense of complacency with respect to TSG's execution of those services."  Id. ¶¶ 4-5, 9-11, 13-15.  Shmuckler advised his clients to stop making their mortgage payments, but he did not thereafter facilitate the loan modifications as promised.  Id. ¶¶ 5, 9, 11, 13.  In addition to the seven counts, each pertaining to a specific victim, the indictment contained a $3 million forfeiture notice.  Id. at 7.

On August 11, 2011, the defendant's motion to waive the Speedy Trial Act was granted over the government's objection.

Dkt. Nos. 12-13. Due to the quantum of discovery in the case, the defendant's unopposed motion to continue the trial was also granted on February 10, 2012, and trial was set for April 18, 2012.[1] Dkt. No. 21. On April 6, 2012, the defendant's motion in limine to exclude evidence that TSG's solicitations were targeted toward certain racial, ethnic, and socioeconomic groups was granted to the extent that such evidence could not be considered during the guilt phase of the trial. Dkt. No. 46. The Court did not restrict the government from raising this issue during sentencing. Id.

The government moved to dismiss Count III of the indictment on April 9, 2012 [Dkt. No. 47]; the next day, Shmuckler pleaded guilty without a plea agreement to the remaining six counts.[2] During his plea colloquy, Shmuckler acknowledged that the written Statement of Facts he had signed was accurate and he agreed that its factual representations, which largely mirrored the allegations in the indictment, were true and accurate. See Statement of Facts [Dkt. No. 49]; Plea Hr'g Tr. [Dkt. No. 76] at 24:12-25:20.

---

[1] The case was transferred from Judge Lee to the undersigned judge on February 2, 2012. Dkt. No. 20.

[2] The government moved to dismiss Count III because the indictment alleged that the wire at issue in that count was sent from Virginia to Minnesota when in fact it was sent from Virginia to Iowa. See Plea Hr'g Tr. [Dkt. No. 76] at 9:4-10. There is no indication that the dismissal of Count III was in exchange for Shmuckler's guilty plea.

3

At the June 25, 2012 sentencing hearing, the Court began by deciding the appropriate Sentencing Guidelines range. See Sentencing Hr'g Tr. [Dkt. No. 77] at 3:9-5:12. The Court found, and both parties agreed, that the base offense level was 7. Id. at 3:6-9. The first major dispute over the Guidelines calculations was the proper enhancement for amount of loss:

> THE COURT: All right. Your first big argument is that the loss amount is excessive, and the problem we have here is that there's no exact science for figuring out the loss amount in this kind of a case. The Probation Office has calculated the loss amount as over $2.5 million. You've offered various alternative approaches to how the loss amount was calculated.
>
> Because there's no exact science to be relatively confident in what is an accurate loss amount, I'm going to give the defendant the benefit of the doubt and reduce the loss amount to between 400,000 but less than 1 million dollars, which means that the actual addition to the base offense level would be 14 points.

Id. at 3:9-21.[3] The Court also found that enhancements were appropriate for sophisticated means, leadership role, abuse of a position of trust, and more than 250 victims. See id. at 3:22-4:15. These enhancements and a two-point deduction for acceptance of responsibility resulted in a final offense level of 31. Id. at 4:16-19. Because the defendant had a criminal history III, the advisory guideline range was calculated to be 135 to 168 months. Id. at 4:20-5:12.

---

[3] Had the Court used the over $2.5 million figure recommended by the United States Probation Office, the addition to the base offense level would have been 18 points. See Presentence Investigation Report [Dkt. No. 53], Worksheet A (Offense Level).

During oral argument on sentencing, the government for the first time requested that the Court continue its decision on restitution:

> One quick comment, Your Honor, with respect to restitution: Calculating restitution has been a very, very difficult process, as I hope the Court can appreciate. We have 865 clients who signed up for TSG's services in the year or so that it was up and running, and we have made every effort to get as accurate a figure for each of them as we possibly can. Doing that, however, look a lot of, a lot of time.
>
> We were optimistic that we would have a complete restitution list more than ten days before sentencing, but we have been unable to do that. In fact, as recently as this morning, the government received five more victim impact statements, so that the loss that we presented to the Court in our supplemental position on sentencing on Friday, which was roughly 1.8 million, is already outdated. We've received some more.
>
> So this is a long way, Your Honor, of asking the Court to consider deferring the restitution decision until a later period of time, when we can make sure that we've gotten all of the additional victim impact statements, if any more come in, factored into the restitution order and then present that to the Court.

Id. at 8:4-24.

Numerous victims appeared at the sentencing hearing, many of whom also spoke. See id. at 14:9-34:6; see also id. at 15:3-5 ("I thought there would be about a half dozen total [victims who wished to allocute]. Having turned around for just the first time a moment ago, I see that the courtroom is full."). Most of the victims who spoke at sentencing and who sent letters to the Court were minorities. See id. at 36:16-22. Several victims required the aid of an interpreter. See id. at 14:22-

15:2 (statement from the interpreter that she had "about a list of seven" victims who needed her assistance).

Many of the victims who spoke at the sentencing hearing had not previously sent their contact information or their loss amounts to the government or to the Court. See id. at 24:15-20 ("THE COURT: If, if anybody has replied to the letter sent by the U.S. Attorney's Office, I already have your situation in the record. I don't need to hear from you in court. The only people I want to hear from at this point are folks who have not filed a letter with the Probation Office or with the U.S. Attorney's Office."). Because so many victims came forward during the time period leading up to sentencing and during the sentencing hearing itself, the Court granted the government's motion to continue the restitution hearing pursuant to 18 U.S.C. § 3664(d)(5). See id. at 34:7-21.

The Court found that a variant sentence was "appropriate under Section 3553(a) because of [Shmuckler's] age, [his] definitely well-documented health situation, and the fact that [he'd] received a significant sentence from the District of Columbia." Id. at 36:9-15. Nevertheless, the Court observed that the high percentage of minority victims was an aggravating factor:

> At the same time, it is absolutely necessary in this case to send a clear message to the general community that they cannot prey on people, especially since most

6

of the folks who testified in court today and whose letters were sent to the Court appear to be minorities, who are in some respects more vulnerable victims because of language impairment and just less familiarity with the American system.

That's a, very much an aggravating factor; and I want to make sure that this sentence reflects the seriousness of this conduct and the need, as I said, to send the word out to other people in the financial and real estate industry that you can't prey on those communities within our area and take advantage of them.

Id. at 36:16-37:3. Shmuckler was accordingly sentenced to a variant sentence of 90 months of incarceration on each count, to be served concurrently, and three years of supervised release. Id. at 4:21-22, 37:4-13. The Court ordered that this sentence be served consecutive to a six-year sentence imposed previously by the United States District Court for the District of Columbia for unrelated fraudulent conduct. Id. at 10:12-13, 11:8-11, 37:4-10.

After the sentencing hearing, the Government compiled an updated list of victims and their losses, which now exceed $1.8 million. See Government's Position on Restitution [Dkt. No. 71]. The issue was fully briefed, and oral argument was heard on August 16, 2012,[4] at which time the Court took the matter under advisement.[5]

---

[4] Shmuckler was not present at the August 16, 2012 hearing, as he had waived his appearance. See Sentencing Hr'g Tr. at 43:2-21.

[5] Because the defendant had filed a protective notice of appeal after the sentencing hearing [Dkt. No. 65], the Court did not have jurisdiction to enter a restitution order during the

7

## II. DISCUSSION

## A. **Statutory Framework**

Shmuckler pleaded guilty to six counts of wire fraud; therefore, restitution in this case is required by the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. §§ 3663A-3664. See id. § 3663A(c)(1)(A)(ii) (providing that the MVRA applies to any "offense against property . . . including any offense committed by fraud or deceit").

Before the MVRA was enacted in 1996, restitution for federal crimes was governed by the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663. The VWPA granted sentencing courts the discretionary power to impose restitution obligations on individuals convicted of certain crimes. See id. § 3663(a)(1). In determining whether to order restitution, courts were required to consider not only the amount of loss suffered by the victims, but also the "financial resources of the defendant, [and] the financial needs and earning ability of the defendant and the defendant's dependents." Id. § 3663(a)(1)(B)(i); see also United States v. Leftwich, 628 F.3d 665, 668 (4th Cir. 2010).

Under the MVRA, in contrast, the sentencing court is

hearing on August 16, 2012. Accordingly, on August 23, 2012, the United States Court of Appeals for the Fourth Circuit granted the parties' joint motion for remand to the district court to allow the amount of restitution to be determined and a restitution order entered. Dkt. No. 78.

required to "order restitution to each victim in the full amount of each victim's losses . . . and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); see also Leftwich, 628 F.3d at 668; United States v. Alalade, 204 F.3d 536, 538-39 (4th Cir. 2000). The government does "bear[] the burden of proving a victim's loss by a preponderance of the evidence." United States v. Wilkinson, 590 F.3d 259, 268 (4th Cir. 2010) (citing 18 U.S.C. § 3664(e)). Once the court determines that the government has met that burden, it is required to order full restitution; the statute affords the court no discretion to adjust the amount. See Leftwich, 628 F.3d at 668 ("[T]he district court is precluded from ordering restitution in any amount less than the full amount of the victim's loss." (citation omitted)). The sentencing court must consider a defendant's financial resources, earning abilities, and other financial obligations, but only for purposes of setting a payment schedule. See id. (citing 18 U.S.C. § 3664(f)(2)).

## B. Defendant's Restitution Obligation

Shmuckler opposes the restitution amount sought by the government, arguing that imposing $1.8 million would require "th[e] Court to make factual findings that would violate Mr. Shmuckler's Sixth Amendment right to have a jury determine all facts, other than those he admitted, that increase the maximum

punishment to which he is exposed." Def.'s Resp. to Government Position on Restitution ("Def.'s Resp.") [Dkt. No. 72] at 1. On this basis, Shmuckler argues that restitution should be limited to $68,970.00, which is the amount alleged in the six counts of the indictment to which he pleaded guilty. In the alternative, he argues that restitution should be limited to $472,813.07, the amount of loss that Shmuckler argues the Court used to determine "relevant conduct" in calculating the advisory sentencing guideline range.[6] Id. at 1-2.

## 1. Sixth Amendment Claim

The parties dispute whether the Sixth Amendment bars the amount of restitution sought by the government. Shmuckler relies heavily on Southern Union Co. v. United States, in which the Supreme Court extended to criminal fines the principle, first articulated in Apprendi v. New Jersey, 530 U.S. 466 (2000), that "[t]he Sixth Amendment reserves to juries the determination of any fact, other than the fact of a prior conviction, that increases a criminal defendant's maximum potential sentence." 132 S. Ct. at 2348-49. Under the Apprendi line of case law, "[t]he statutory maximum . . . is the maximum

_____

[6] In fact, the Court did not make a specific finding as to loss amount, other than reducing the over $2.5 million figure recommended by the Probation Office, which would have added eighteen points to the base offense level, to an amount "between 400,000 but less than 1 million dollars," which added only fourteen points to the base offense level. See Sentencing Hr'g Tr. 3:9-21.

sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 2350 (quoting Blakely v. Washington, 542 U.S. 296, 303 (2004)) (internal quotation marks omitted).

In Southern Union, the defendant corporation was found guilty of improperly storing hazardous chemicals in violation of 42 U.S.C. § 6928(d)(2)(A). Id. at 2349. A conviction under that statute is punishable by a fine of up to $50,000.00 per day of violation. Id. Although the jury did not make a finding as to the precise duration of the statutory violation, and in fact the government had argued at trial that conviction was proper if the evidence proved even a single day of violation, the sentencing court concurred with the presentence report and found that Southern Union had been in violation for all 762 days alleged in the indictment. Id. Based on this finding, the court set a maximum potential fine of $38.1 million. Id. From this potential maximum, the court imposed an actual fine of $6 million plus a $12 million community service obligation. Id.[7] Reversing and remanding, the Supreme Court stated that "our

---

[7] The district court did not hold that Apprendi was inapplicable to criminal fines; rather, it found that the maximum potential fine of $38.1 million was justified from "the content and context of the verdict." Id. at 2349 (internal quotation marks omitted). The First Circuit, however, reached the opposite conclusion: it found that the jury verdict did not support a finding that the statute was violated for 762 days, but held that Apprendi did not apply to criminal fines and on that basis affirmed the sentence. Id.

11

decisions broadly prohibit judicial factfinding that increases maximum criminal sentences, penalties, or punishments -- terms that each undeniably embrace fines." Id. at 2351 (alterations, citations, and internal quotation marks omitted).

Shmuckler argues that this holding applies with equal force to restitution and that the Court is limited by the amounts specifically identified in the counts of the indictment to which he pleaded guilty. He acknowledges that the restitution statutes, 18 U.S.C. §§ 3663(a)(2) and 3663A(a)(2), "permit the Court to go beyond the specific facts of the conviction and award restitution to all victims proximately harmed" by defendant's conduct, but maintains that, in light of Southern Union, those statutes cannot be applied without violating the Sixth Amendment. Def.'s Resp. at 3.

Before Southern Union, the Fourth Circuit confronted the issue presented here and joined courts in every other circuit which had considered the issue in holding that the Apprendi line of case law does not apply to restitution. See United States v. Rattler, 139 F. App'x 534, 536 (4th Cir. 2005) ("Because there is no statutory maximum for restitution, the Sixth Amendment and Booker do not apply to restitution ordered by the sentencing court."); see also, e.g., United States v. Sosebee, 419 F.3d 451, 454, 461-62 (6th Cir. 2005) ("[W]e hold that restitution is not subject to Booker analysis because the statutes authorizing

restitution, unlike ordinary penalty statutes, do not provide a determinate statutory maximum."); United States v. Swanson, 394 F.3d 520, 526 (7th Cir. 2005) (holding that "because there is no prescribed statutory maximum for restitution orders, Blakely [and] Booker . . . do not affect the manner in which findings of restitution amounts must be made) (internal quotation marks omitted); United States v. Wooten, 377 F.3d 1134, 1144 (10th Cir. 2004) (holding that because there is no prescribed statutory maximum for restitution, restitution orders are unaffected by Blakely). These cases recognized Apprendi and its progeny, in particular Blakely v. Washington, 542 U.S. 296 (2004), and United States v. Booker, 543 U.S. 220 (2005), and nevertheless found that restitution is unique within the statutory sentencing scheme and unlike other forms of penalties for Sixth Amendment purposes.

Shmuckler urges the Court to find that the reasoning in Southern Union abrogates the holdings in these cases.[8] See Def.'s Resp. to Government's Supplemental Position on

---

[8] In the Defendant's Notice of Supplemental Legal Authority ("Def.'s Notice") [Dkt. No. 81], Shmuckler recognized, as he must, that this Court "is bound [sic] the Fourth Circuit's decision in" United States v. Day, -- F.3d --, No. 11-5218, 2012 WL 5954690 (4th Cir. Nov. 29, 2012), discussed infra. Nevertheless, he "maintains that Day has incorrectly limited Southern Union's holding by failing to recognize that restitution is subject to a statutory maximum – the amount of loss found by a jury or the amount of loss to which a defendant admitted in pleading guilty." Def.'s Notice at 2.

Restitution ("Def.'s Supp. Resp.") at 2. His argument fails because restitution is <u>not</u> a fine, despite Shmuckler's contention that "for Sixth Amendment purposes," they are "no different." Def.'s Resp. at 4. To be sure, numerous cases have held that restitution, as part of the criminal sentence, is a criminal penalty. <u>See, e.g.</u>, <u>Pasquantino v. United States</u>, 544 U.S. 349, 365 (2005); <u>Kelly v. Robinson</u>, 479 U.S. 36, 46-49, 49 n.10 (1986); <u>United States v. Nicholson</u>, 676 F.3d 376, 382 (4th Cir. 2012); <u>United States v. Leahy</u>, 438 F.3d 328, 335 (3d Cir. 2006). But not every punitive aspect of a sentence necessarily implicates <u>Apprendi</u>. For example, the Supreme Court has held that the Sixth Amendment does not prohibit judges from finding facts that would determine whether to impose consecutive or concurrent sentences, a determination at least as punitive as the amount of restitution. <u>See</u> <u>Oregon v. Ice</u>, 129 S. Ct. 711, 715 (2009).

The application of a right to a jury determination under <u>Apprendi</u>, therefore, turns not on whether the outcome is punitive, but rather on whether the legislature has "encroach[ed] on the jury's traditional domain" in giving the fact-finding duties at issue to a judge. <u>Id.</u> at 717 (citing <u>Apprendi</u>, 530 U.S. at 477). Unlike criminal fines, which "were by far the most common form of noncapital punishment in colonial America," <u>Southern Union</u>, 132 S. Ct. at 2350, restitution has

14

historically rested outside the domain of the criminal jury
trial.  See Richard E. Laster, Criminal Restitution: A Survey of
Its Past History and an Analysis of Its Present Usefulness, 5 U.
Rich. L. Rev. 71, 75-77 (1970) (explaining that at common law,
"the king [took] the entire compensative payment and thus
effectively destroy[ed] the process of community composition and
raise[d] punishment to the level of satisfaction," while legal
theorists "contend[ed] that victims were satisfied just by being
a part of a proceeding which protected the state" (citing 4
William Blackstone, Commentaries 133 (Chitty ed. 1826))).
Indeed:

> The common law developed so as to prevent the victim
> from receiving restitution until he did everything in
> his power to get the wrongdoer to justice.  The
> decisional law created the crime of "theftbote," making
> it a misdemeanor for the injured party to take his goods
> back or make other arrangements with the felon on an
> agreement not to prosecute.  Felonies suspended the
> civil remedies of the injured party, with the statutory
> exception of bankers, until the felon was acquitted or
> convicted.

Id. at 76.  Fines were well understood to be completely distinct
from restitution: "[i]nstead of restoring the victim to his
original position, the payment of a fine to the king was aimed
at punishing the criminal and increasing the wealth of the
state."  Id. at 77.

This historical backdrop highlights the difference between
the criminal fines at issue in Southern Union and the

15

restitution order required by the MVRA, which moves away from the philosophy at common law toward a more victim-centric approach. The Supreme Court has observed that the "substantive purpose" of the MVRA is "primarily to assure that victims of a crime receive full restitution." Dolan v. United States, 130 S. Ct. 2533, 2539 (2010). This fundamental difference in history and philosophy distinguishes Southern Union from the issue before the Court.

Moreover, the issue raised by Shmuckler has recently been resolved by the Fourth Circuit in United States v. Day, -- F.3d --, No. 11-5218, 2012 WL 5954690 (4th Cir. Nov. 29, 2012), which squarely rejected Shmuckler's Sixth Amendment argument, finding:

> Critically, however, there is no prescribed statutory maximum in the restitution context; the amount of restitution that a court may order is instead indeterminate and varies based on the amount of damage and injury caused by the offense. As a consequence, the rule of Apprendi is simply not implicated to begin with by a trial court's entry of restitution.

Id. at *17 (citations omitted) (emphasis in original); see also United States v. Wolfe, -- F.3d --, No. 11-3281, 2012 WL 6028903, at *11 (7th Cir. 2012) (holding that Southern Union and Apprendi do not apply to restitution because "restitution is not a criminal penalty"). In so holding, the panel dismissed the argument that Southern Union abrogated the Fourth Circuit's pre-Southern Union case law, stating that "far from demanding a change in tack, the logic of Southern Union actually reinforces

the correctness of the uniform rule adopted in the federal courts to date," which holds Apprendi inapplicable to restitution orders.  Day, 2012 WL 5954690, at *17.

Finally, and most specifically, the concern about notice and fairness to defendants evinced in the jurisprudence arising out of Apprendi is unwarranted in this case.  The Blakely Court expressed apprehension about a criminal justice regime "in which a defendant, with no warning in either his indictment or plea, would routinely see his maximum potential sentence balloon from as little as five years to as much as life imprisonment based not on facts proved to his peers beyond a reasonable doubt," but on facts compiled after a trial or plea in a Pre-Sentencing Report.  542 U.S. at 311-12 (emphasis added) (citation omitted); see also Ice, 129 S. Ct. at 721 (Scalia, J., dissenting) ("There is no Sixth Amendment problem with a system that exposes defendants to a known range of sentences after a guilty verdict.").  Shmuckler was put on notice before he pleaded guilty that his restitution obligation could be as high as $3.9 million, an amount far greater than the government now seeks:

> THE COURT: [P]lease put on the record the full exposure that the defendant has. . . .
>
> MR. BELEVITZ: Yes, Your Honor.  A fine of the higher of $250,000 or twice the gross gain or loss, full restitution, a special assessment for each count, and three years of supervised release.

> THE COURT: All right. And the restitution, at this point, what is the government's estimate of that?
>
> MR. BELEVITZ: Approximately $3.9 million.
>
> THE COURT: All right. Mr. Shmuckler, do you understand the exposure that you have with these six guilty pleas? That is, as to each count, you could receive up to 20 years of imprisonment followed by three years of supervised release, you will have a fine possibility of $250,000 or twice the total amount of the gross gain or loss, and there's a $100 special assessment per count of conviction, so there are six counts of conviction, and those are always cumulative, so you're looking at a total of $600 in special assessments. Do you understand that?
>
> THE DEFENDANT: Yes, Your Honor.

Plea Hr'g Tr. at 10:13-11:8. The indictment also included a $3 million forfeiture count; the Court explained to the defendant that this provision allowed the government to take his property for purposes of satisfying a restitution judgment:

> THE COURT: [T]he Government will go after . . . any kind of property they can find that they could then sort of cash in, so to speak, for the $3 million to assist in making the restitution in this case if necessary. Do you see that?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: All right, in other words, the financial impact of this case on you is quite severe. Do you understand that?
>
> THE DEFENDANT: Yes, Your Honor.

Id. at 13:3-16. Given the language in the indictment and the plea colloquy, Shmuckler was on full notice of his financial exposure when he knowingly and voluntarily pleaded guilty. Moreover, in the signed Statement of Facts supporting his guilty

plea, he "acknowledge[d] that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities." Statement of Facts ¶ 9. For Shmuckler to argue now that the federal Constitution prohibits restitution to any victims other than those whose losses were alleged in the indictment turns the notice and fairness rationale of this line of cases on its head.

For all these reasons, the Court holds that the Sixth Amendment does not prohibit ordering restitution for an amount exceeding the $68,970.00 in victim losses alleged in the indictment.

### 2. The Amount of Restitution

Shmuckler argues in the alternative that, even if the Sixth Amendment does not cabin restitution, the Court's adoption of an amount of loss ranging from $400,000 to $1 million for purposes of calculating the advisory Guidelines range is binding as to restitution. The Court finds this argument without merit.

The MVRA provides:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

18 U.S.C. § 3664(d)(5).[9] The statute thus contemplates that the restitution amount may be calculated after the sentencing hearing. It follows from this statutory framework that the restitution amount may not strictly correlate to the amount of loss calculated for purposes of determining the appropriate Guidelines range at sentencing.

Moreover, the calculations are governed by different standards. Under the Sentencing Guidelines, "[t]he court need only make a reasonable estimate of the loss," by "taking into account, as appropriate and practicable under the circumstances," several factors provided in the Guidelines. See U.S.S.G. § 2B1.1 cmt. n.3(C)-(F). The MVRA, in contrast, requires more specificity, in that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," with the burden on the government as to amount of loss and on the defense as to his financial resources and the financial needs of his dependents.

---

[9] In this case, the government did not abide by this timing requirement and moved for continuance of the restitution determination orally during the sentencing hearing. See Sentencing Hr'g Tr. at 8:4-24. The "failure to comply with the ten-day limit" is harmless absent a showing of prejudice from the defense. See United States v. Johnson, 400 F.3d 187, 199 (4th Cir. 2005). Aside from a generalized statement that such a delay "prejudices Mr. Shmuckler's ability to have his case adjudicated efficiently," Def.'s Supplemental Position on Sentencing [Dkt. No. 60] at 7, the defense has made no showing of prejudice. Accordingly, the Court finds that the government's failure to abide by the 10-day timing provision of 18 U.S.C. § 3664(d)(5) was harmless error.

18 U.S.C. § 3664(e). It would make little practical sense for the "reasonable estimate" of loss calculated for purposes of determining the Guidelines range to bind the Court's loss determination in the face of more concrete evidence than was available during the sentencing proceeding.[10]

To calculate the total amount of restitution that must be awarded in this case, Federal Bureau of Investigation Special Agent Joshua Huckel and other agents interviewed approximately 322 TSG clients, out of approximately 865 clients total. Position of the United States with Respect to Sentencing [Dkt. No. 57], Ex. 1, Decl. of Joshua Huckel in Supp. of Sentencing ("Huckel Decl.") ¶¶ 15, at 3. Special Agent Huckel also consulted letters that Shmuckler's victims wrote to the United States Attorney's Office. Id. ¶ 19, at 4. Using information

---

[10] Shmuckler cites United States v. Dokich, 614 F.3d 314 (7th Cir. 2010), for the proposition that "it is legally 'impossible' for restitution to exceed the loss found for purposes of the Sentencing Guidelines." Def.'s Resp. at 2 (citing Dokich, 614 F.3d at 319-20). Dokich did not consider the circumstances of this case, in which the amount of restitution could not be adequately determined at the sentencing hearing and had to be delayed until a later time, as allowed by the MVRA. See Dokich, 614 F.3d at 317 ("At the end of the sentencing hearing, the district court turned to restitution."). When the actual loss of the victims cannot yet be ascertained with precision, using a "reasonable estimate" to calculate the Guidelines range is entirely reasonable.

Moreover, any error in calculating the amount of loss for purposes of the Guidelines sentence is harmless in this case, as the Court would have imposed the same variant sentence for the reasons stated on the record even if the Guidelines range had been higher.

from these letters and interviews, from TSG's client database, and from records of bank accounts Shmuckler controlled, Special Agent Huckel compiled a list of victims whose mortgages were not modified through TSG and the amount each victim paid TSG. Id. ¶¶ 14, 19, at 3, 4. This list was later amended twice to add the amounts paid by victims who sent letters that were received after the earlier declarations had been filed. See Supplemental Position of the United States with Respect to Sentencing [Dkt. No. 61], Ex. 1, Second Decl. of Joshua Huckel in Supp. of Sentencing ¶¶ 2-4, at 1; Government's Position on Restitution [Dkt. No. 71], Ex. 1, Third Decl. of Joshua Huckel in Supp. of Sentencing ("Third Huckel Decl.") ¶¶ 3-5, at 1. The final restitution figure using these calculations was $1,848,279.00. Third Huckel Decl. ¶ 5, attach. A.

Shmuckler contests the government's position that all these victims are entitled to restitution, arguing instead that only those victims who never received mortgage modifications or other relief[11] and who specifically recalled fraudulent statements

---

[11] It appears that there may be some dispute between the parties regarding whether certain victims received mortgage modifications. Compare, e.g., Def.'s Position on Sentencing, Ex. 2 (listing nine victims whom the defense contends "Received Loan Modification"); with Huckel Decl. ¶ 19 ("I compiled a list of victims whose mortgages were not modified through TSG."); id. attach. E (listing eight of the nine victims identified by the defense). If these victims received mortgage modifications through alternative means, they have still suffered a loss in the amount of the fee they paid TSG for services that were not

during their interviews or who were given a contract that included an excessive success rate are so entitled. See Def.'s Position on Sentencing [Dkt. No. 56] at 6-10, Ex. A. The Court finds that Shmuckler's misrepresentations were not isolated incidents affecting some clients but not others; rather, as the government argues, his lies pervaded the entire TSG enterprise. Accordingly, all of the individuals listed in the attachment to the Third Huckel Declaration are victims of fraud that are entitled to relief.

### III.   CONCLUSION

For the reasons stated above, the Court finds the appropriate amount of restitution in this case to be $1,858,279.00. An Order to this effect will be issued with this Memorandum Opinion.

Entered this 17th day of December, 2012.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

performed by TSG. If the dispute is over whether TSG actually obtained the loan modifications, the Court credits the representation of Special Agent Huckel, made under penalty of perjury, over that of defense counsel in their pleadings.